# IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No: 1:16-cr-00313 |
| | ) | |
| JUSTIN GRAY LIVERMAN | ) | Honorable Gerald Bruce Lee |
| | ) | *Sentencing 9/8/17* |
| _____ | ) | |

## DEFENDANT'S POSITION ON SENTENCING

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure, Section 6A1.3 of the United States Sentencing Guidelines ("Guidelines"), and this Court's Policy Regarding Procedures to be Followed in Guideline Sentencing, the Defendant, JUSTIN GRAY LIVERMAN, through counsel, has received and reviewed the Pre-Sentence Investigation Report ("PSR"), prepared by NINA BLANCHARD.

In January, Mr. Liverman stood before this Court and accepted responsibility for his actions. He pleaded Guilty to one count of Conspiracy with relevant conduct of Intentionally Cause Damage to a Protected Computer, Anonymous and Repeated Telephone Harassment a Misdemeanor Offense, and Identity Theft. There is one charged codefendant, Andrew Otto Boggs and several unindicted coconspirators under indictment in England including "Cracka," the undisputed leader of the crew to which Mr. Liverman admitted he belonged – "Crackas With Attitude."

This memorandum relies heavily upon the evaluation of Dr. Michael Hendricks. The defense hereby incorporates Exhibit A, Psychological Evaluation in Aid of Sentencing, the evaluation of Mr. Liverman by Dr. Hendricks, as part of Defendant's Position on Sentence.

Defendant Boggs has already been sentenced and received a two year sentence.

Much of Mr. Liverman's involvement involved importuning Cracka to keep committing incursions into protected computers and gain protected information that rose to the level of identity theft.  Liverman was directly involved in two facets of the case: (1) publishing leaked documents and (2) hiring an auto-dialing service that dialed many victims hourly to harass and disturb them.

A significant loss number was placed in the Presentence Report, and, as such, Mr. Liverman's adjusted offense level was increased to 25. Both Ms. Blanchard and the Government have suggested the Court sentence Mr. Liverman to 57 months. 57 months is the bottom of the guideline range.  60 months is the statutory maximum for this crime.

Ms. Blanchard, however, failed to conduct an independent investigation of the losses claimed by the victims in this case pursuant to Rule 32(c)(1)(B) of the Federal Rules of Criminal Procedure, thereby not giving the Court the ability to assess restitution in this matter. Instead, the PSR blindly accepted the Government's accounting of the losses and assessed a Guidelines computation, offense level, and restitution value, thereby providing a sentence recommendation to the Court that is

improper and which is not based on the required investigation. The Defense thus objects to the PSR's sentencing recommendation and restitution recommendation, and requests a full and fair hearing thereon.

## I.    APPLICATION OF U.S.C. §3553(a) Factors

In Kimbrough v. United States, 128 S. Ct. 558 (2007), the Supreme Court held that the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory factors detailed in 18 U.S.C. §3553(a).   Courts must consider the recommended guideline range as one of seven co-equal statutory sentencing factors referenced in 18 U.S.C. §3553(a).   United States v. Booker, 543 U.S. 220, 259-60 (2005). The factors to be considered are: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide for just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.  See 18 U.S.C. §3553(a).

After considering these factors, the Court has discretion to differ with the U.S.S.G.'s custody range, See Rita v. United States, 127 S. Ct. 2456 (2007).  Indeed, a sentencing court may not even presume the Guidelines range is reasonable.  Gall v.

United States, 128 S.Ct. 586, 596-97 (2007); Rita v. United States, 127 S. Ct. 2456, 2465 (2007).   Nor may the court require "'extraordinary' circumstances to justify a sentence outside the Guidelines range." Gall, 128 S. Ct. at 595.  The Court must make an "individualized assessment" based on the facts as presented by the parties.  Id. at 597.  Furthermore, the sentencing courts must impose only the minimum sentence that is sufficient to accomplish the objectives of §3553. See 18 U.S.C. §3553(a); Kimbrough v. United States, 552 U.S. 85, 101 (2007).

A sentence which is sufficient, in this case, but not greater than necessary, is far less than the guideline range of 57 to 71 months that the probation office calculated. Mr. Liverman's life circumstances warrant a mitigated two year sentence, equivalent to the sentence of the codefendant.   Application of the §3553(a) factors supports the defense position.

A. THE NATURE AND CHARACTERISTICS OF MR. LIVERMAN

**1.  Mr. Liverman's family history and psychological examination**

Mr. Liverman, a youthful defendant, sets forth the factors the Court should consider in determining what type of disposition is appropriate. The parties have agreed on an adjusted level of 25, which provides for a maximum of 71 months incarceration.   The statutory maximum is 60 months.   Therefore, an analysis of statutory directives set forth in 18 U.S.C. §3553(a) is appropriate to assist the Court in

determining an appropriate disposition that is sufficient, but not greater than necessary.

The following, mostly through the report of Dr. Hendricks, a forensic psychological examiner quite familiar with and respected by courts, investigated and examined Mr. Liverman's background, character, and value system in an effort to understand his behavior in this case. An intricate look into his tragic childhood and upbringing also gives insight into a life-long struggle for a sense of self-worth. Mr. Liverman's interpersonal relationships in the physical world, or "IRL" (in real life) as they are called by Internet denizens, are few and troubled.  That is why his online relationships are so important.  We ask that the Court now reference Dr. Hendrick's report in its entirety, instead of counsel summarizing the medical diagnosis. Dr. Hendricks' report is critical to understanding Mr. Liverman's mentality and involvement in this case.

An examination and application of the factors in 18 U.S.C. § 3553(a)(1) shed light upon Mr. Liverman such that the Court will understand why a Booker variance is warranted.

Mr. Liverman's medical, family and social history were compiled by Dr. Hendricks following extensive interviews with Mr. Liverman, family members, and friends. An in-depth investigation was conducted into Mr.Liverman's personal background and life history. This included a review of his employment records (in the

PSR), medical records, a description of Mr. Liverman's criminal history and character reference letters (Exhibits Attached to PSR).1

Mr. Liverman excels at school today and has a 3.75 GPA.  More importantly, he holds certifications in Comp TIA, Security+, MTA (Microsoft) in networking fundamentals, MTA in Windows Operating System Fundamentals, MTA in Security Fundamentals. He also received several additional certifications prior to his incarceration in this case.   Mr. Liverman also has several certifications that have lapsed due to advancing technology and he was renewing those certifications prior to his present incarceration.   Certifications in the Internet Technology world are consistently expiring as products get upgraded.  However, as Mr. Liverman remained engaged in his studies, re-certifying would not have been a problem for him. Certifications are the number one factor in getting hired in the Information Technology field.  It does not hurt that he was a stellar student that made Dean's List.

### 2.  Mr. Liverman's juvenile arrest

A more detailed and personal statement of Mr. Liverman's criminal activity when he was 16 bears discussion.   In his own words, Mr. Liverman describes his juvenile and only previous brush with the law:

> *"I was hanging out with my friends from school, we all played on the*
> *varsity soccer team for Warwick, our High School. In everyone's eyes we*
> *were the "good kids" in school as in we all took International*

---

1 Upon request of the Court, Counsel can approach the Bench and present copies of Mr. Liverman's medical records.

*Baccalaureate level classes, played sports and never got in trouble. However, a big soccer game for the season was coming up soon against our rival, Menchville High School. One of the seniors who came over to hangout had an idea for a "Senior Prank"(prank that the senior class does before graduating)."*

*"Even though none of us were seniors we looked up to him because he was captain of the team, so we agreed to do it. So basically the prank was to just go spray paint WHS (Warwick High School) over a previously spray painted road marked by our rivals with MHS (Menchville High School). It was dumb but we wanted to please our older classmates. We got caught by police were cited even though we spray painted something that was already spray painted. I was made to pay $50.00 and the case was dismissed."*

**3. Courts have recognized that youthful offenders should be treated differently and lesser sentences should be afforded to young offenders.**

The discussion of Mr. Liverman's juvenile criminality dovetails well into the next discussion, that of the youthful offender in general.  Mr. Liverman's conduct and the offense itself must be seen in the context of a youthful offender, as Mr. Liverman was 22 at the time of offense. *Roper v. Simmons*, 543 U.S. at 571-572 is instructive, though not directly apposite in that Mr. Liverman is a youthful offender but not a juvenile.  Even so, Dr. Hendricks' report discusses and concludes that Mr. Liverman is

very immature and that his emotional growth was stunted when he was abandoned first by his parents, and then a second time by his Aunt and Uncle. He has poor social skills and poor emotional development.

In *Roper*, the Supreme Court cited research studies noting juveniles have a lack of maturity, of the type that Mr. Liverman has, and sense of responsibility compared to adults. Adolescents were found to be over-represented statistically in virtually every category of reckless behavior. The Court noted that in recognition of the comparative immaturity and irresponsibility of juveniles, almost every state prohibited those under age 18 from voting, serving on juries, or marrying without parental consent. The studies also found that juveniles are more vulnerable to negative influences and outside pressures, including peer pressure. They have less control, or experience with control, over their own environment. They also lack the freedom that adults have, to escape a criminogenic setting. However, psychologists have expanded the definition of adolescent and youthful up to the age of 25.

There is a trend sweeping across the nation to recognize that young people that do not qualify as juveniles should nonetheless be subjected to treatment commensurate with their maturity.  For example,

- California Penal Code section 3051(a) defines a "Youth Offender Parole Hearing" as any hearing before the board for the purpose of reviewing the parole suitability of any prisoner who was under 23 years of age at

the time of his or her controlling offense.  As noted, Mr. Liverman was

22 at the time of the offense.

Also, as it pertains to Mr. Liverman, the sentence is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent, motives, role in the offense, and mental illness (depression, anxiety) or other diminished capacity."[2] The guidelines include none of the factors bearing on Mr. Liverman's degree of culpability.  At the time of the offense, Mr. Liverman was on too

---

[2] *Richard S. Frase, Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment "Proportionality"Relative to What?, 89 Minn. L. Rev. 571, 590 (February 2005).*

much Prednisone[3], was suffering from rashes, depression, anxiety and had volatile family issues that led him to seek refuge in the computer world - - where he felt like a big person. The overdose of Prendisone is covered in the PSR and Dr. Hendricks' report. Dr. Hendricks notes some of the factors in Fn. 3. Fn. 3 is a significantly more comprehensive list.

_____

[3]          **Excess use of Prendisone**

Prednisone side effects

Get emergency medical help if you have any of these signs of an allergic reaction to prednisone: hives; difficult breathing; swelling of your face, lips, tongue, or throat.

Call your doctor at once if you have:

•          blurred vision, eye pain, or seeing halos around lights;

•          swelling, rapid weight gain, feeling short of breath;

•          severe depression, feelings of extreme happiness or sadness, changes in personality or behavior, seizure (convulsions);

•          bloody or tarry stools, coughing up blood;

•          pancreatitis (severe pain in your upper stomach spreading to your back, nausea and vomiting, fast heart rate);

•          low potassium (confusion, uneven heart rate, extreme thirst, increased urination, leg discomfort, muscle weakness or limp feeling); or

•          dangerously high blood pressure (severe headache, blurred vision, buzzing in your ears, anxiety, confusion, chest pain, shortness of breath, uneven heartbeats, seizure).

Other common prednisone side effects may include:

•          sleep problems (insomnia), mood changes;

•          increased appetite, gradual weight gain;

•          acne, increased sweating, dry skin, thinning skin, bruising or discoloration;

•          slow wound healing;

•          headache, dizziness, spinning sensation;

•          nausea, stomach pain, bloating; or

•          changes in the shape or location of body fat (especially in your arms, legs, face, neck, breasts, and waist).


**Prednisone Overdose**

If a corticosteroid overdose is severe enough, it can be dangerous and cause heart rhythm problems.

Symptoms of a corticosteroid overdose may include:

•          Burning or itching skin

•          Convulsions

•          Deafness

•          Depression

•          Dry skin

•          High blood pressure

•          Muscle weakness

•          Nervousness

•          Psychosis

•          Sleepiness

•          Missed menstrual cycle

•          Swelling in lower legs, ankles, or feet

•          Weakness

•          Worsening of health conditions such as ulcers or diabetes

The Supreme Court has cited youth as an important mitigating factor on multiple occasions. See *Gall supra*, 552 U.S. at 58 ("Immaturity at the time of the offense conduct is not an inconsequential consideration….While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant.") (quoting sentencing court). See *Id*. (stating, in harmony with the above article, that "[r]ecent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five," and noting that "the recent [National Institute of Health] report confirms that there is no bold line demarcating at what age a person reaches full maturity."). As the Supreme Court has explained, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Roper v. Simmons*, 543 U.S. 551 (2005). Moreover, courts have also recognized that young or first-time offenders are good candidates for lower sentences based on their lowered risk of recidivism, as established in Sentencing Commission studies. See, e.g., *United States v. Ross*, 557 F.3d 237 (5th Cir. 2009); *United States v. Prisel*, 316 F. App'x 377 (6th Cir. 2008); *United States v. Cabrera*, 567 F. Supp. 2d 271 (D. Mass. 2008) (citing studies).

A history of mental health issues is also an important mitigating factor, for two main reasons. First, courts recognize that a defendant should be judged less harshly when his criminal conduct was spurred in part by a mental health condition. Second,

diagnosis and treatment of a defendant's mental health problems is one of the strongest factors that reduces the risk of recidivism.  Here, Mr. Liverman has suffered from anxiety and depression that were so extreme at times that he had suicidal ideation.

No doubt these issues, which were undiagnosed at the time, played heavily into the poor judgement that gave rise to these crimes.


**4.    This Court should grant a *Booker* variance and impose a sentence of 24 months based solely upon the characteristics of Mr. Liverman (18 U.S.C. § 3553(a)).**

As we have discussed, the Guidelines are advisory and are not presumed reasonable. *United States v. Booker,* 125 S. Ct. 738, (2005), *Gall v. United States*, 128 S.Ct. 586, 591 (2007).

Mr. Liverman has participated in many projects that allowed for him to lawfully showcase his skills as a computer technician and lawful system penetration tester.  A penetration tester is an ethical hacker that finds vulnerabilities in a computer system or network and reports them and helps fix them.  Mr. Liverman is most proud of his participation in "Hack the Pentagon," an exercise wherein young people were permitted to search for vulnerabilities in the Pentagon's cyber-defense systems.

Concentrating on the the benign ways in which he can contribute to the world using his technology skills, Mr. Liverman is disappointed in hurting the victims in this



case using those skills. Mr. Liverman accepts responsibility and is sincerely remorseful.

Mr. Liverman has made Dean's list and excelled in school prior to his arrest. His scholastic achievements show us a young man with potential. Mr. Liverman will be able to rejoin society as a productive and meaningful member upon release.

Mr. Liverman requests for this Honorable Court to vary from the calculated advisory guideline range that exceeds 60 months and instead impose 24 months in prison – the same sentence co-defendant Boggs received.

## B. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE (*18 U.S.C.§ 3553(A)(1)*) AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

The charged offense related to Mr. Liverman involve him conspiring with others to commit target offenses of identity theft, harassment and offenses.  It is plain and cannot be stated otherwise: The minor's conduct is deplorable. The offense is a serious one.

However, Dr. Hendrick's report paints the accurate picture of a scared young boy with little "real life contact and who felt like a "big man" on the internet.  He discusses that in detail.

In harmony with the factors relating to the offender analysis of the facts of this case and application of §3553 factors favor a mitigated sentence of 24 months and an appropriate term of post-release supervision.  We suggest two years is an appropriate term of post-release supervision.

As discussed briefly in the introduction to this memorandum, Mr. Liverman was the instigator and principal in two transgressions that bear further discussion:

(1) Publishing leaked documents on the WikiLeaks website.  It is of note that Mr. Liverman himself, with a huge tug from his conscience, and knowing he was betraying all other members of the conspiracy, redacted the information to preserve some of the privacy and embarrassment of the victims in this case.  While it was a caring, compassionate and human action, and a project that took him some decent degree of time, it ultimately was a largely ineffective attempt at saving the victims from any of the negative effects that come with having your identity and job description made on this particular publication platform.  Mr. Liverman recognizes that.  Many of

the emails hacked by "Cracka" were published on WikiLeaks.[4]  Though misguided. Mr. Liverman thought at the time that he was exposing holes in the personal security that bore upon our nation's cyber security. AOL email is the least used of all of the larger free email services.   It does not update its security to keep up with advancing technology. Mr. Liverman thought he was doing some sort of service by showing the world that the head of the CIA didn't take any steps to secure his personal data.  He may have been right that personal security for top government officials was extraordinarily sub-par, but he was so, so wrong in the way he went about showing it. He recognizes that and feels remorse for the publication of private data on a public website.  This Court can be sure it isn't territory he would ever dare venture into again.

(2) We can credibly state, based upon the evidence herein, that Mr. Liverman's central role in organizing the electronic telephone harassment of multiple victims, including family members of the primary victims was the most significant action he took with respect to his criminality and morality as it relates to thus case.  He hired an auto dialing service that made calls to the victims and victim's family members on the

_____

[4] This is not to say that WikiLeaks lacks moral fiber and does not play a role on the global stage – quite the contrary. Many valuable lessons about high level government officials securing their personal data were learned by this incident. That is not the point that Mr. Liverman wishes to make.  That point was made by WikiLeaks.  After the instant response and subsequent investigation herein, security procedures aimed at protecting personal and national security and privacy, policies have been upgraded and personal data has been made much more secure than it ever was prior to this incursion. It should be certain that never again will a head of the CIA use an AOL email account to store confidential and classified documents.

hour every hour and these calls had pre-recorded threatening and vulgar messages. Phone numbers had to be changed and made private.   This was a highly important transgression to the victims as has been made clear by the victim impact letters.   Mr. Liverman continually demonstrated remorse in conversations with Counsel (me).   Of all of his actions, the fact that he disturbed the lives of all these victims via the auto-dialer caused him great pain.

### C. THE PURPOSES OF SENTENCING *(18 U.S.C. § 3553(a)(2))*

**1.      The Seriousness of the Offense and Promoting Respect for the Law, and Just Punishment *(18 U.S.C. § 3553(a)(2)(A))*.**

Promoting respect for the law means more than merely doling out harsh punishment. As noted by the Supreme Court in *Gall v. United States*, 128 S. Ct at 599, an overly harsh sentence "may work to promote not respect, but derision of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."

Cases involving youngsters still in late adolescence, however, have become especially difficult at sentencing as judges must determine punishment by striking a balance between punitive measures appropriate for those late adolescents that require incapacitation in order to protect the community and those like Mr. Liverman, who have no significant criminal and can be rehabilitated and have become a productive member of society.

In *United States v. Gall*, *supra,* the United States Supreme Court reviewed a probationary sentence and found it to be reasonable in light of the application of the §3553 factors.

### 2.      Deterrence *(18 U.S.C. § 3553(a)(2)(B))*

There are two types of deterrence for the Court to consider – general deterrence, i.e., deterrence of others, and specific deterrence, i.e., deterrence of Mr. Liverman.  As to general deterrence it must be noted that scientific studies regarding deterrence suggest that it is the *fact* of a sentence, not its length that has a deterrent impact.[5] This would seem particularly true in the case of low level offenders, like Mr. Liverman, who has never been to prison before, and who feel punished not just by incarceration but also by the social embarrassment, the ongoing label resulting from being a convicted felon, and the continuing intrusion into their lives created by the supervised release which follows any term of imprisonment. 8 of Mr. Liverman's 25 offense level points come from the loss amount escalator.  2B1.1b.

Mr. Liverman understands that he is to be imprisoned in this case, and he is confident that his imprisonment will be to serve the ends of "general deterrence," which is to say that it will exemplify that this is a wrong that one cannot commit without suffering sanction of a penal nature in addition to the other sanctions that naturally

---

[5] Kleck, et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623,653 (2005)

and judicially flow from the sort of act that defendant has been convicted of committing.

As to specific deterrence, the Court can be very sure that Mr. Liverman has learned a lesson and will never do anything like this again.   Indeed, his violation of his supervised release was based upon a long-standing drug addiction.  The drug addiction stemmed from living with his father, a decades-long drug abuser and addict.   We request that the Court recommend, and we assert that the Court should recommend that Mr. Liverman be placed in the Residential Drug and Alcohol Program.   The combination of Mr. Liverman's illegal drug use and his excessive amount of Prednisone speak toward an individual that may have acted based upon an abuse of drugs and alcohol – something for which Mr. Liverman has never had treatment.   He has the ability to rehabilitate if given the chance.

As many courts have recognized, time in custody has greater significance for those imprisoned for the first time, and thus, that a lesser prison term is sufficient to deter a defendant who has never been subject to prior lengthy incarceration. See, e.g., *United State v. Baker*, 445 F.3d 987 (7th Cir. 2006) (affirming downward variance to 78 months from 108 months justified in part by judge's finding that prison would mean more to the defendant than one who has been imprisoned before, which resonated with the goal of "just punishment" in § 3553(a)(2)(A) and "adequate deterrence" in Section 3553(a)(2)(B)); *United States v. Cull*, 446 F. Supp. 2d 961 (E.D. Wis. 2006) (non-guideline sentence of 2 months in jail and 4 months home confinement, where advisory

range was 10-14 months for marijuana offense by defendant who had never been confined, was sufficient to impress on him the seriousness of his crime and deter him from re-offending).

Borrowing from *United States v. Bergman*, 416 F.Supp. 496, 498-99 (S.D.N.Y. 1976), which some say is the quintessential judicial sentencing memorandum, defendant offers the following: "… the goal of rehabilitation cannot fairly serve in itself as grounds for the sentence to confinement."

Mr. Liverman must acquiesce that it would be unjust to not hold him accountable in any respect.  Even so, what has transpired here cuts against a sentence that includes actual imprisonment that exceeds the amount given to Mr. Boggs – 24 months.  The "closing of prison doors" has already had a profound effect upon Mr. Liverman in the short time he has been incarcerated for the possession of cocaine.  Counsel has spoken with Mr. Liverman and is aware of his changed attitude.  He takes his incarceration very seriously.  He has gotten the message that incarceration sends.  There are situations wherein the age, background and specific criminality of a defendant would militate towards a simple probationary sentence with conditions.  This is such a case.   Liverman's background and prospects call out for him to be removed from society for a period of time, but not more than 24 months.

### 3.  The Need to Protect Society *(18 U.S.C. § 3553(a)(2)(B))*

One initial factor to consider in evaluating the need to protect society, in this particular case, is that first time offenders generally have a low risk of recidivism. This lack of criminal history is significantly relative to recidivism. The Sentencing Commission has stated as follows in this regard:

> The analysis [of empirical data on re-offending] delineates recidivism risk for offenders with minimal prior criminal history and shows that the risk is lowest for offenders with the least experience in the criminal justice system.
>
> *U.S.S.C.,"Recidivism And The First Time Offender,"* (May 2004).

The sentence imposed must also "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(c) *Gall* aptly observed that the standard conditions of probation imposed upon defendants "substantially restrict their liberty". Mr. Liverman does not request, nor should he be granted, probation.  Even so, the analysis in *Gall* is significant in that it goes to probation and not a custodial sentence.  With appropriate conditions, probation empowers the court to ensure rehabilitation, full restitution to victims, payment of fines, protection of the public, and compliance with the law. If the defendant fails to comply, the violation of probation gives the judge power to mete out greater punishment, including incarceration. As noted, "Probation is not leniency." *United States v. Bragg*, 582 F.3d 965, 973 (9th Cir. 2009).

Likewise, a custodial sentence of 24 months followed by 2 years of supervised release is not at all a lenient sentence in this case.  It serves all of the aims of justice delineated in section 3553.

Once again *Bergman* is instructive: "Equally clearly, this defendant should not be confined to incapacitate him. He is not dangerous. It is most improbable that he will commit similar, or any, offenses in the future. There is no need for "specific deterrence."" 416 F.Supp. 499.   Accordingly, a sentence in excess of 24 months is "greater than necessary, to comply with the purposes" of sentencing.


### 4.  The need to provide restitution

The desire to make the victims whole also militates in favor of a lower sentence. As a term of the plea agreement, and as part of his attempts to take responsibility, Mr. Liverman has already agreed to pay the full determined amount of restitution, almost two hundred thousand dollars.  However, Liverman's ability to repay the victim's losses would be greatly hindered by any prison term greater than the 24 months requested by the defense - - his computer certifications - - for the most part - - will be out of date and he will need to re-certify.   The longer Mr. Liverman is incarcerated, the more out of date his knowledge will be, and the harder it will be to re-certify.   As previously discussed, certificates drive the value of an IT professional.  The sooner he can get back to his studies and update his certifications, the sooner Mr. Liverman will have an opportunity to pay restitution.  Indeed, were he to finish his education and re-certify,

his prospects for paying significant restitution on an expedited schedule are excellent. A term of prison as discussed would allow Mr. Liverman not only to make early progress toward paying the rather hefty restitution fine in this case, but also to finish his education – and thus make him infinitely employable.

### 5.  The Most Effective Sentence (18 U.S.C. § 3553(a)(2)(D)

The sentence imposed must also "provide the defendant with needed *educational or vocational training, medical care*, or other correctional treatment in the most effective manner."  Under the circumstances of this case, incarceration is the most effective means of affording Mr. Liverman the ability to obtain drug rehabilitation and to handle his allergies, rashes, breathing issues and other maladies. Mr. Liverman, as previously mentioned, has a family history of drug abuse and can use some rehabilitation in that regard, but more than 24 months will be greater than necessary.

The continued supervision of Mr. Liverman in the community is the only sure-fire manner, that Mr. Liverman will receive the proper guidance, counseling, vocational training and education needed to improve his future employability. We agree that 24 months of supervised release after his period of incarceration is appropriate.

## II.    ADDITIONAL CONSIDERATIONS

1. **Use of proxy servers and TOR are common and ordinary and are not conduct that the court should consider Mr. Liverman to be a sophisticated criminal because he uses these tools**

The use of a proxy server or the browsing software known as The Onion Router or TOR cannot categorically be found to be a sophisticated means, because it is so common and ordinary that an enhancement on this basis is unjustified.   Moreover, VPN proxy servers are typically used in the course of business, entirely for legitimate and legal purposes.

A "proxy server" is merely a mechanism where one computer communicates with another, the "proxy" and that proxy computer acts on behalf of the original user and sends the results to the user. It has the effect of creating another layer of identification, or protection, for the original user, but does not make detection impossible. Moreover, the layer of identity protection is not the only reason that these services are used.  For instance many companies use VPNs so that each of its employees have remote access to the company's servers when they travel. Of course, these employees are using laptops which may also be used for personal purposes. Thus, many users of proxy servers are hardly aware that they are using them.

A proxy server requires no technical sophistication on the part of the user, no more than for any of the technologies we all use on a regular basis. We all use sophisticated technology. The computers we use are sophisticated, and so are our smartphones. The cars we used to get here are sophisticated, as are the many

computerized features in the car. There are sophisticated security features enabled on each of these devices, to prevent theft, identify fraud, and other abuses of our privacy. We even use sophisticated technology to keep our homes safe, and while this technology is becoming increasingly more advanced, is also becoming more commonplace and easy to use. To argue that each of these uses is a "sophisticated means" would mean that ordinary behavior, that is otherwise protected and even encouraged, is appropriate to be used to enhance a criminal sentence.

Likewise, the use of TOR is as ubiquitous.  Tor is free software for enabling anonymous communication. The name is derived from an acronym for the original software project name "The Onion Router". Tor directs Internet traffic through a free, worldwide, volunteer network consisting of more than seven thousand relays to conceal a user's location and usage from anyone conducting network surveillance or traffic analysis. Using Tor makes it more difficult for Internet activity to be traced back to the user: this includes "visits to Web sites, online posts, instant messages, and other communication forms". Tor's use is intended to protect the personal privacy of users, as well as their freedom and ability to conduct confidential communication by keeping their Internet activities from being monitored.   The core principle of Tor, "onion routing", was developed in the mid-1990s by United States Naval Research Laboratory.

**2. The CFAA is flawed and punishments are disproportionate to the crimes themselves and the true harm caused**

Based upon enhancement levels for loss, sentences for CFAA crimes that may otherwise seem that they would fall lower on the guideline scale, are beset with guideline ranges that are grossly disproportionate to the actual crime itself. The crime, in that it leaves such unfettered discretion and carries such harsh penalties based upon loss calculations and guideline elevators, has been referred to privately as the "Prosecutor's best friend."

According to Digital rights group and the leading authority on cyber-law, the Electronic Frontier Foundation, commonly known as the EFF: "One of the basic tenets of a civilized society is that the punishment should be proportionate with the crime. [Recent cases are] an illustration of prosecutorial discretion run amok—and once again shows why reform of the federal anti-hacking statute, the Computer Fraud and Abuse Act (CFAA), is long overdue."

The CFAA was written in 1984, largely as a response to the movie "War Games." It was written when the internet was in its nascence. In 1984, one had to use a modem to dial up a particular computer network to access their information. To gain information from, for example, Stanford University, you had to seek out the University itself and access it, and only it. You were, in essence, going to a stand-alone store to shop.

In 1991, http protocol was invented. At that time, one could simply type Stanford.edu into a browser and – bingo – your computer was connected to Stanford University. HTTP protocol and browsers made the internet more akin to shopping at a

mall, one could roam from store to store freely and conveniently. 1984 was a whole different world than now, or even December 2010. Yet the harsh online civilization of 1984 is still being revisited in 2016. Despite the wild variance in the types of crimes committed in 1984 and 2010, the punishments remain the same. Again and again, computer criminals are treated like thought criminals and are sent off to the proverbial Room 101.

These inequitable results are a direct correlation to the fact that we are using horse and buggy laws to handle a jet plane society. On this argument alone Liverman, deserves a Booker variance.


## III.   CONCLUSION

Mr. Liverman is before the Court for sentencing. He has entered a guilty plea to a single count of Conspiracy, with relevant conduct of violating the Computer Fraud and Abuse Act, identity theft and making repeated and harassing phone calls. Mr. Liverman is disgraced and ashamed of his behavior. Nevertheless, he stands before the Court and requests compassion and understanding. He believes that comes in the form of a 24 month sentence.

Mr. Liverman has many personal challenges at the moment, but nevertheless he is ready to accept responsibility for his actions and move forward with his life. He is ready to pay his debt to society and to begin to right the wrongs he has committed. This sentiment was inferred by former Attorney General Eric Holder in his comments

made to the ABA House of Delegates on August 21, 2013 "...too many Americans go to too many prisons for far too long, and for no truly good law enforcement reason."

A guideline sentence of 57 months to the maximum of 60 months is excessive and much greater than necessary in this case. A sentence of 24 months is sufficient but not greater than necessary herein. The 24 months should be followed by 24 months of supervised release, which is a "substantial restriction of freedom."

It is respectfully requested that the Court impose a 24 month sentence followed by two years of supervised release.

Respectfully Submitted,
Justin G. Liverman
By Counsel:

/s/

Marina Medvin, VSB # 78820
*Local Counsel for Defendant*
MEDVIN LAW PLC
916 Prince St, Ste 109
Alexandria, Virginia 22314
Tel: 888.886.4127
Fax: 703.870.3772
Email: marina@medvinlaw.com

/s/

Jason S. Leiderman, Sbn 203336
*Pro Hac Vice Counsel For Defendant*
LAW OFFICES OF JAY LEIDERMAN, PC
770 County Square Drive 101
Ventura, California 93003
Tel: 805-654-0200
Fax: 805-654-0280
jay@criminal-lawyer.me

/s/
Tor Ekeland
Pro Hac Vice Counsel For Defendant
tor@torelekand.com
TOR EKELAND, P.C.
155 Water Street
Brooklyn, NY 11201
Tel: 718-285-9279
Fax: 718-504-5417


## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2017, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following: Karen.Taylor2@usdoj.gov, joseph.longobardo@usdoj.gov, maya.song@usdoj.gov

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy print copy of the foregoing will be delivered to Chambers within one business day of the electronic filing.

/s/
Marina Medvin, VSB # 78820
Attorney for Defendant

MEDVIN LAW PLC
916 Prince Street, Ste. 109
Alexandria, Virginia 22314
Tel:  703.870.6868
Fax: 703.870.3772
Email: marina@medvinlaw.com