IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 1:16-CR-313 |
| ) | |
| JUSTIN GRAY LIVERMAN ) | Hon. Rossie D. Alston, Jr. |
| (a/k/a "D3F4ULT"), ) | |
| ) | |
| Defendant. | |

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

Defendant Justin Liverman has over a year remaining on his sentence for engaging in an online hacking and harassment scheme against senior U.S. government officials. Despite showing neither an extraordinary nor compelling reason for release, defendant has moved *pro se* to immediately cut his sentence under 18 U.S.C. § 3582(c)(1)(A) on the basis of the COVID-19 pandemic. Because defendant, 28 years old, has not met his burden under § 3582(c)(1)(A), his motion should be denied. Using compassionate release in his case would fail to address a range of important practical and legal problems and would not satisfy the standards in § 3582(c)(1)(A).

## BACKGROUND

From at least November 2015 to February 2016, defendant conspired with others to break into U.S. government officials' online accounts and law enforcement databases to steal data, harass law enforcement, and gain infamy. The group dubbed themselves "Crackas With Attitude" or "CWA," and with their hacking activity they caused victims more than $1.5 million in losses. Statement of Facts (SOF) ¶ 4 (ECF No. 54). Their victims included senior government officials and their spouses, and a CEO of a government contractor that provided IT services. *Id.* ¶¶ 5-24 (describing Victims 1-5). Other victims included the Palm Beach County

Sheriff's Office in Florida, to whom defendant and a co-conspirator called in a hoax bomb threat in January 2016, resulting in evacuation of the sheriff's office and deployment of a bomb squad. *Id*. ¶¶ 26-27.

Defendant engaged in this harassment and intimidation campaign to achieve online notoriety and for his own amusement. As part of CWA, defendant identified victims for the group to target; attempted to unlawfully access victims' accounts; and solicited and published personal information about government employees. For example, in December 2015, defendant encouraged the conspiracy to target Victim 3 – then a senior U.S. government official – and Victim 3's spouse in its hacking and phone harassment scheme, because of the Victim's public statements about Edward Snowden. SOF ¶¶ 14-19. Defendant also encouraged his conspirators to target Victim 4, who at the time was a senior government official who worked for a federal law enforcement agency. *Id.* ¶¶ 21-23.

As part of CWA, defendant also made harassing phone calls, sent threatening text messages and e-mails, and harassed members of victims' families. For Victim 2, for example, a senior government official so identified in defendant's plea papers, defendant arranged in November 2015 for Victim 2's phone to receive hourly threatening messages for thirty days. SOF ¶ 8. Defendant also sent multiple text messages to Victim 2 that threatened harm, disparaged the victim's family, and included a photograph of his son. *Id.* ¶ 9. Defendant also posted Victim 2's phone number to social media accounts and invited others to harass the government official. *Id.* ¶ 11. Defendant and his co-conspirators also used Victim 2's official credentials to obtain unauthorized access to a U.S. government computer system used by law enforcement agencies, intelligence groups, and criminal justice entities. *Id.* ¶ 13. From this system, defendant obtained a list of over 80 police officers and law enforcement employees in

the Miami, Florida area, along with their work contact information, and he made this information publicly available online in January 2016.  *Id.* ¶ 13.

In January 2017, defendant pleaded guilty to a criminal information that charged him with conspiracy to commit identity theft, unauthorized access to a protected computer, and making harassing telephone calls, all in violation of 18 U.S.C. § 371.  ECF Nos. 47 (Information), 53 (Plea Agreement).  While awaiting sentencing, defendant violated his terms of release by possessing cocaine and drug paraphernalia, and he was arrested on a bench warrant issued by this Court in July 2017.  ECF Nos. 60 (Petition for Action), 66 (Arrest Warrant executed).  In September 2017, defendant was sentenced to 60 months' imprisonment and 3 years of supervised release, and he was ordered to pay restitution, jointly and severally with his co-defendant, in the approximate amount of $145,900.

Defendant's *pro se* motion before this Court seeking compassionate release was docketed on July 29, 2020.  ECF No. 83 ("Def. Mot.").  His anticipated release date, according to the Bureau of Prisons Inmate Locator, is November 22, 2021.

## ARGUMENT

**I.  The Court should weigh a number of practical considerations in evaluating defendant's request for compassionate release.**

The Federal Bureau of Prisons ("BOP") is actively working to contain the spread of the coronavirus within prisons.  BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, provided masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under 18 U.S.C.

§ 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act.[1] This last step carries special importance for defendant's request for compassionate release.

Before the CARES Act was passed, § 3624(c)(2) provided BOP with the exclusive authority to "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." This provision is in keeping with BOP's authority to designate where an inmate serves a sentence. Congress has now, temporarily, expanded § 3624(c)(2), while leaving its application to BOP. As part of the CARES Act, Congress sought to address the spread of the coronavirus in prison by permitting BOP to expand the use home confinement under § 3624(c)(2). Section 12003(b)(2) of the Act suspends, during the coronavirus emergency, the limitation in § 3624(c)(2) that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, once the Attorney General makes requisite finding that emergency conditions will materially affect the function of BOP.[2] The Attorney General made those findings on April 3, 2020, conferring on BOP the authority to expand its use of home confinement.

Since March 26, 2020, BOP has placed over 7,780 inmates on home confinement (*see* https://www.bop.gov/coronavirus/index.jsp) (last visited Oct. 14, 2020), focusing on, among other factors, the vulnerability of particular inmates, the prisons most at risk, and the dangers posed by inmates if released. Inmates do not have to apply to be considered for home

---

[1] *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act").

[2] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

confinement.

In weighing the appropriateness of home confinement, BOP considers, among other factors, whether a home is available where the inmate could be confined, whether the inmate could receive appropriate food and medical care there, the comparative risk to the inmate in home confinement in the identified location versus remaining in prison, the inmate's risk to the public through recidivism, and the availability of supervision during home confinement or risk to the public if supervision is lacking.  BOP also seeks to ensure that the inmates it releases to home confinement are not already ill and therefore spreading infection to others—including spreading illness to the individuals who would be needed to make home confinement successful.  To help accomplish that goal, BOP is requiring a 14-day quarantine period before any inmate is released to home confinement.

In addition to these efforts to increase the use of home confinement, BOP is continuing to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

Current modified operations plan require that all inmates in BOP institutions be secured in their assigned cells/quarters for a period of at least 14 days to stop any spread of the disease.  Only limited group gatherings are permitted, with social distancing required to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access.  Further, BOP has severely limited the movement of inmates and detainees among its facilities.  Though there will be exceptions for medical treatment and similar exigencies, this step also limits transmission.

All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved.  Every newly admitted inmate is screened for COVID-19 risk

factors and symptoms.  Asymptomatic inmates with risk of exposure are placed in quarantine.  Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.  In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms.  Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone.  A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.*, medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems.  All volunteer visits are suspended absent authorization by the Deputy Director of BOP.  Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were temporarily stopped in March 2020.  Social visits were only recently resumed on October 3, 2020, as part of BOP's COVID-19 Phase Nine action plan.  These visits are non-contact and subject to significant restrictions.  *See* bop.gov/locations/institutions/ftd/ftd_modified_visiting_procedures.pdf (last visited Oct. 14, 2020).  To ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month.  Tours of facilities are also suspended.  Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.  Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

Rather than relying on BOP to address what both Congress and the Attorney General have determined is a time-sensitive, rapidly evolving emergency—and after Congress placed a specifically targeted tool in the hands of BOP via § 12003(b)(2) of the CARES Act—defendant envisions a system where hundreds of federal district judges around the country try to use the tools of litigation to replicate, and potentially override, BOP's efforts. And critically, under defendant's approach, courts must attempt to assess facts that can change within days—if not hours—when many of the changing circumstances could nullify the intended goal of any court order.

In any event, the Court's adjudication of the defendant's motion necessarily touches on many of the following fact-specific issues:

- *Safety of place of home detention.* An inmate's proposed residence after release from prison should be a place where no person is infected or soon to be infected.

- *Avoiding recidivism.* The conditions and place where a defendant will stay after release must limit the risk of recidivism—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points.[3] New arrests not only endanger the public and return an inmate to prison, but also increase the dangers to arresting officers and supervising probation officers.

- *Protecting the public from infection.* Any release should include measures to assure that an inmate who is presently incarcerated is not infected by the time that the Court ordered any release, undermining the benefits of the release.

- *Evaluating how much of a difference a defendant's proposal would make to disease transmission inside defendant's prison.* Before a defendant receives the benefit of being released from prison, a court should determine the extent to which releasing a particular inmate makes a difference to disease transmission in one of the 30 BOP facilities and 6

---

[3] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12.

      residential reentry centers that BOP is monitoring for coronavirus infections. *See* https://www.bop.gov/coronavirus/.

- *Assessing how much release would affect the particular inmate's health.* To justify cutting short an inmate's sentence, a defendant's release should make a sufficiently great improvement to the odds of maintaining an inmate's health.

This list is not exhaustive and, indeed, could include many additional considerations. The key point is that, in light of the BOP's efforts to control the spread of COVID-19, the Court should exercise its discretion in such a way as to grant compassionate release only where the defendant's medical situation, the presence of coronavirus at his facility of confinement, and the statutory sentencing factors support doing so. For the reasons that follow, this is not such a case.

## II. The defendant has not established a sufficient basis for compassionate release.

The government at the outset agrees that the Court has jurisdiction to address the merits of defendant's motion under § 3582(c)(1)(A), because defendant has given BOP more than 30 days to evaluate his motion for compassionate release based on the threat of COVID-19. The compassionate release statute provides, in pertinent part:

> The court may not modify a term of imprisonment once it has been imposed except that—
>
>     (1) in any case—
>
>     (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment ....

18 U.S.C. § 3582(c)(1)(A). Here, defendant applied to the warden of his facility for relief under § 3582(c)(1)(A) in April 2020, and the warden denied relief that same month. *See* Exhibit A (Letter from Warden David E. Ortiz).

On the merits of his motion, compassionate release is not appropriate because the defendant has not established "extraordinary and compelling reasons" for such relief under § 3582(C)(1)(A)(i). The defendant bears the burden to demonstrate that he is entitled to compassionate release. *See White v. United States*, 378 F. Supp. 3d 784, 785 (W.D. Mo. 2019); *see also generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005) ("Absent some reason to believe that Congress intended otherwise … the burden of persuasion lies … upon the party seeking relief.").

Courts in this district have found "extraordinary and compelling reasons for compassionate release [on the basis of COVID-19] when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. White*, — F. Supp. 3d —, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (quoting *United States v. Feiling*, 453 F. Supp. 3d 832, 841 (E.D. Va. Apr. 10, 2020)).[4] The existence of the pandemic, standing alone, is not a sufficient basis for granting compassionate release. As the Third Circuit put it, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

The defendant has failed to meet his burden of showing that "extraordinary and compelling reasons" exist to warrant early compassionate release pursuant to § 3582(c)(1)(A)(i)

---

[4] *See also United States v. Little*, No. 1:10-CR-135 (CMH), 2020 WL 3442173, at *2 (E.D. Va. June 23, 2020) (adopting the criteria from *Feiling*); *United States v. White*, No. 3:18-CR-61, 2020 WL 3442171, at *5 (E.D. Va. June 23, 2020) ("Defendant's request for release on home confinement is based upon nothing more than 'the mere possibility that COVID-19 will spread to his facility'-a fear that is insufficient to justify release." (citing *Feiling*)).

because he has not shown the existence of both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility. *Feiling*, 453 F. Supp. 3d at 841. Indeed, defendant has shown neither.

### A. The defendant has not demonstrated that he faces higher susceptibility to COVID-19.

Defendant has not shown that he is at particular higher risk from COVID-19. He cites only his asthma as placing him at increased risk of illness from the virus. Def. Mot. at 2. But according to CDC criteria, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html, asthma does not definitively entail a greater risk of severe illness. Instead, the CDC advises that adults with moderate-to-severe asthma "might" be at an increased risk from the virus. *Id.* (last visited Oct. 14, 2020).

In conforming with the medical consensus that asthma standing alone is not a significant risk factor with respect to COVID-19, courts nationwide have denied motions for compassionate release where the only risk factor the defendant presented was asthma. *See, e.g.*, *United States v. Freedland*, 2020 WL 4926542, at *4 (E.D. Pa. Aug. 21, 2020) ("in light of the CDC's recommendation that asthma may only possibly increase a person's risk of severe illness from COVID-19 and Mr. Freedland's active lifestyle and general lack of asthma-related life impairments, the Court concludes that Mr. Freedland's asthma does not present an extraordinary and compelling reason to reduce his sentence."); *United States v. Davis*, 2020 WL 2488574, at *4 (C.D. Ill. May 14, 2020) ("Although asthma is a risk factor for COVID-19 complications, Defendant does not allege his condition is particularly severe or not controlled with medication. In fact, Defendant submits he uses an inhaler to manage his asthma symptoms.").[5]

---

[5] *See also United States v. David*, 2020 WL 2526568 (W.D. Wash. May 18, 2020) (defendant does not show that asthma is more than mild, controlled with an inhaler); *United*

Notably, defendant's asthma does not even appear to rise to the level of moderate-to-severe. Asthma is considered moderate persistent when "symptoms occur daily" and at night "more than 1 time per week," those "[s]ymptoms interfere with daily activities," and "[i]nhaled short-acting asthma medication is used every day." *See* "Classification of Asthma," https://www.uofmhealth.org/health-library/hw161158; *see also United States v. Miles*, 2020 WL 3256923, at *3 (E.D. Cal. June 16, 2020) ("While defendant presents evidence to support the conclusion his asthma is chronic and something he has lived with since childhood, he does not present evidence or argument his condition is 'moderate to severe.' BOP's clinical practice guidelines suggest those suffering from 'moderate persistent' to 'severe persistent' asthma conditions exhibit, at a minimum, daily symptoms, nighttime awakenings, some limitation or interference with normal activity and varying degrees of lung functionality."). According to defendant's recent BOP medical records, in a March 2020 examination, defendant presented with clear lungs and no evidence of crackles, rhonchi, wheezing, or other respiratory distress. *See* Exhibit B at 1 (under seal, BOP medical records).[6] His medical records indicate that he received a renewed prescription for an asthma inhaler in October 2019, with the instructions not to use it daily but instead as needed. *Id.* at 3.

The defendant also has not made a sufficient factual record that his medical needs will not be met while incarcerated or that he will be able to obtain or afford better medical care once released. "Chronic conditions that can be managed in prison are not a sufficient basis for

---

*States v. Abram*, 2020 WL 3097259 (E.D. Mich. June 11, 2020) (asthma is not moderate or severe, but rather is well controlled with inhaler); *United States v. Ramos*, 2020 WL 1685812, at *2 (S.D.N.Y. Apr. 7, 2020) (asthma is well-controlled).

[6] Exhibit B contains all pages from defendant's recent BOP medical records, received from BOP representatives in September 2020, that contain the word "asthma."

compassionate release." *United States v. Ayon-Nunez*, 2020 WL 704785, at *2-*3 (E.D. Cal. Feb. 12, 2020) (internal quotation marks omitted) (denying motion for release). "BOP's guidance, read in conjunction with the Application Notes to § 1B1.13, indicate that a defendant's medical condition must be one of substantial severity and irremediability . . . ." *United States v. Lisi*, No. 15-CR-457, 2020 WL 881994, at *4 (S.D.N.Y. Feb. 24, 2020), *reconsideration denied*, 2020 WL 1331955 (S.D.N.Y. Mar. 23, 2020).

> Section 1B1.13 provides that a defendant can establish an extraordinary and compelling reason if he is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover."

*Lisi*, 2020 WL 881994, at *4 (quoting U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)). The defendant here has also not shown that his asthma is "of substantial severity and irremediability" as required. *Lisi*, 2020 WL 881994, at *4 (denying motion for compassionate release).

In view of defendant's treated mild asthma, his age, and otherwise good health, his medical condition does not constitute an "extraordinary and compelling reason" justifying compassionate release under 18 U.S.C. § 3582(c)(1)(A).

### B. The defendant has not shown that his prison facility is at heightened risk of a coronavirus outbreak.

With respect to an individualized showing regarding defendant's prison facility, his claim is equally unpersuasive. Defendant is incarcerated at FCI Fort Dix in New Jersey, and the facility currently has 9 inmates and 0 staff members who have tested positive for COVID-19. There have been no inmate or staff deaths from the virus at FCI Fort Dix. *See* bop.gov/coronavirus (last visited Oct. 14, 2020). To date, 35 inmates and 6 staff members at defendant's facility have recovered from the virus. *Id.* Those numbers are relative to a total current inmate population at the FCI of 2,466. BOP's statistics show that nationwide, over

13,930 inmates have recovered from COVID-19. *See id.*

Notably, FCI Fort Dix has taken significant safety measures in addition to those described above that BOP has implemented nationwide at its facilities to limit the spread of COVID-19. As described by the clinical director at FCI Fort Dix, Dr. Turner-Foster, in a May 2020 filing in the United States District Court for the District of New Jersey, FCI Fort Dix has taken a number of additional measures in response to the COVID-19 pandemic, including providing inmate and staff education; conducting inmate and staff screening; putting into place testing, quarantine, and isolation procedures in accordance with BOP policy and CDC guidelines; ordering enhanced cleaning and medical supplies; and taking a number of other preventative measures. *See* Exhibit C (Decl. of Dr. Turner-Foster from *Wragg v. Ortiz*), ¶ 16; *see also id.* ¶¶ 17-24 (describing specific safety measures). [7] For all of these reasons, defendant has not shown, in any particularized fashion, that he is entitled to additional relief based on the risk of contracting COVID-19.

### C. In the exercise of its discretion, the Court should deny compassionate release in light of the statutory sentencing factors.

Compassionate release is only appropriate where the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). That statute instructs the court to consider several factors, including whether the underlying offenses constitute crimes of violence, whether the offenses involved firearms, and the defendant's criminal record. At the same time, § 3582(c)(1)(A) expressly directs the Court to consider the statutory sentencing factors under 18 U.S.C. § 3553(a) in adjudicating a

---

[7] Dr. Turner-Foster's declaration was filed in *Wagg v. Ortiz*, 1:20-CV-5496, ECF No. 28-6 (D.N.J. May 18, 2020), as part of the government's response to a putative class-action suit brought by FCI Fort Dix inmates seeking release in light of the COVID-19 pandemic. The district court in that case dismissed the inmates' complaint in May 2020.

13

compassionate-release motion.

In light of the additional statutory factors to consider, defendant's BOP records further counsel against granting defendant's motion. His inmate disciplinary records show that last November, defendant admitted to possessing computer hacking/programming books, Sentry database codes, and the ID number and email address of a staff member. He admitted to stealing staff information. *See* Exhibit D (under seal, miscellaneous BOP records), at 1, 3. This conduct echoes defendant's crime of conviction. This past April, defendant was found to have further violated rules when he admitted to the significant violation of being in possession of a hazardous tool. *See id.* at 1. Further, BOP has determined as part of defendant's inmate profile that he poses a "medium risk" of recidivism. *Id.* at 4. On these facts, the Court should exercise its discretion to deny defendant's motion for compassionate release.

Finally, if this Court were to disagree with the United States' position, any release order should require defendant to undergo a 14-day quarantine controlled by BOP.

## CONCLUSION

For the reasons stated above, the Court should deny defendant's motion for release.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney


By: __/s/_____
Maya D. Song
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: 703-299-3700
Fax: 703-299-3981
maya.song@usdoj.gov

**CERTIFICATE OF SERVICE**

      I certify that on October 14, 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing (NEF) to all counsel of record. I also certify that by the next business day, the U.S. Attorney's Office will mail a copy of this filing to the defendant's address of record, namely:

    Justin Gray Liverman (No. 62701-056)
    FCI Fort Dix
    Federal Correctional Institution
    P.O. Box 2000
    Joint Base MDL, NJ 08640

    *Defendant*

By:     /s/
    Maya D. Song
    Assistant United States Attorney
    United States Attorney's Office
    2100 Jamieson Avenue
    Alexandria, VA 22314
    Office: (703) 299-3700
    Fax: (703) 299-3980
    Email: maya.song@usdoj.gov